BILLY CLEGHORN b/n/f CURTIS CLEGHORN, Plaintiff-in-Error, v. EZELL THOMAS, Defendant-in-Error.

CURTIS CLEGHORN, Plaintiff-in-Error, v. EZELL THOMAS, Defendant-in-Error.—432 S.W.(2d) 507.

Middle Section. March 15, 1968.

Certiorari Denied by Supreme Court October 7, 1968.

Snow & Poteet, Cookeville, for plaintiffs in error.

Crawford & Barnes, Cookeville, for defendant in error.

PURYEAR, J. These two consolidated cases arose out of an accident in which a three year old boy, Billy Cleghorn, was seriously burned about the feet and legs.

Since the plaintiffs-in-error here were the plaintiffs below and the defendant-in-error here was the defendant

below, we will refer to the parties here as plaintiffs and defendant, in addition to referring to them by name.

The plaintiff, Curtis Cleghorn, is the father of plaintiff, Billy Cleghorn. The child's suit is for damages in the sum of $75,000.00 for personal injuries. The suit of the parent, Curtis Cleghorn, is for $10,000.00 damages for loss of services and medical expenses incurred as a result of injuries to the child.

The plaintiff, Billy Cleghorn, alleges in his declaration, that on or about July 7, 1964, the defendant, Ezell Thomas, was operating a roof and sheet metal business, maintaining a shop and office in the basement level of a building in Cookeville, Tennessee; that on the date hereinbefore mentioned the defendant negligently left a "tar kettle", containing hot molten tar, parked on Boyd Street, adjacent to the building where defendant's place of business was conducted; that such "tar kettle" had a faucet on it which was not locked or secured and no precautions were taken to keep children from being exposed to the danger of such hot molten tar.

The declaration further alleges that on the day hereinbefore mentioned, the plaintiff was lawfully upon Boyd Street and, while exhibiting the normal curiosity and interest of a child of his age, opened the unsecured valve on the "tar kettle", allowing molten tar to run out of such valve or faucet upon the feet and legs of plaintiff and seriously injuring him.

The material averments of the declaration in the parent's case are substantially the same as those in the child's case, with the exception however, that the parent sues for damages for loss of services and medical expenses.

The defendant filed general issue pleas of not guilty in each case and they were consolidated and tried together before the Circuit Judge, Honorable John D. Holladay and a jury.

At the conclusion of introduction of evidence for plaintiffs, motions for directed verdict were made by the defendant, which motions were overruled at that time. However, at the conclusion of all of the evidence, the trial Judge sustained such motions for directed verdicts and the cases were dismissed.

After plaintiffs' motions for new trial were overruled, they prayed and perfected their appeals in error to this Court and have filed a single assignment of error, in which they challenge the trial Court's action in directing verdicts for defendant in both cases.

The facts, appearing from the evidence, can be briefly summarized as follows:

The defendant operated a business known as Thomas Sheet Metal Works in the basement portion of a building located at the intersection of Staley Avenue and Boyd Street, in Cookeville, Tennessee, on July 7, 1964, and for some period of time prior thereto. The defendant owned and used, in connection with his roofing business, a "tar kettle" for the purpose of heating and liquifying tar and asphalt that was used in coating roofs. Defendant customarily parked this "tar kettle" on Boyd Street, adjacent to his place of business, and Boyd Street comes to a dead end at about the point where he usually parked this kettle or within a short distance from the place where it was parked.

There was a dwelling across the street from defendant's place of business and the occupants of that dwelling, together with other persons who occupied buildings in this vicinity, used Boyd Street as a means of ingress and egress to such buildings.

It also appears from the evidence that children were accustomed to playing in Boyd Street, near the defendant's place of business and in the area where he customarily parked or stored the "tar kettle."

On the date of the accident, the plaintiff, Curtis Cleghorn, was employed by the defendant as a member of a crew of men working on a roof, the other two members of the crew being Lynn Mahane and Charles Elley, the latter named employee being in charge of the crew. The defendant was not present at the time of the accident. Also, at the time of the accident, Mahane and Elley were eating lunch in a restaurant nearby.

At about the noon hour on the day in question, the defendant's roofing crew finished a job upon which they were working and on which they had used the kettle for heating and melting tar or asphalt that was applied to the roof where they were working and the crew brought the kettle back to the place where it was customarily parked or stored on Boyd Street, at about noon, at which time the kettle contained a quantity of hot molten tar or asphalt.

The plaintiff, Curtis Cleghorn, and his wife lived at Algood, Tennessee, and they had made plans to move to the town of Cookeville, so, on the day in question, Mrs. Cleghorn met Mr. Cleghorn in Cookeville, and brought him his lunch, also bringing with her in the family automobile their five children, including Billy, and parked

the automobile on Boyd Street near the defendant's place of business. It was a hot July day and upon arrival of Mrs. Cleghorn and the children, some of the children expressed a desire for a drink of water, whereupon Mr. Cleghorn took them out of the automobile and to some place in the vicinity where he obtained drinking water for them. Mr. Cleghorn then returned to the automobile with the children, placed all of them back in the automobile, opened one of the doors, sat upon the seat of the automobile, leaving the door open, and prepared to eat his lunch, while he and Mrs. Cleghorn discussed their plans for moving.

At the precise time Mr. Cleghorn began to eat his lunch, Billy was playing around on the floor of the automobile, amusing himself with the pedals and, within a few minutes thereafter, he left the atuomobile, unnoticed by either of his parents, and they heard him scream, whereupon they went to him, found him standing at the faucet of the "tar kettle" with hot molten tar running down on his feet and legs, as a result of which he was seriously burned.

Because of its importance in determining whether or not the uncontradicted evidence in the case shows that the parents were guilty of negligence which proximately contributed to the accident, we quote Mr. Cleghorn's testimony on this phase of the matter verbatim as follows:

"Q. Alright, just tell the jury where your lunch had come from and how you got it, and so forth, just tell the jury,

A. I was working and we was talking about moving back here to town, and my wife came to pick up some

boxes at dinner so we could get ready to move, and she brought my lunch up here to me so I wouldn't have to buy it, you know—it'd be cheaper for her to bring it to me than it would to go to a restaurant here somewhere, you know, and I was setting out there and she pulled up and she had the kids in the car when she brought my dinner to me, and lot of times, you know, kids want a drink of water when they come up there, and I take them out and give them a drink of water and put them right back in the car. Well, let's see three-four of them went with me to get a drink of water and I took them all and put them back in the car and I carried that little boy there, I carried him back and put him in the car, in the front seat, and I was setting there eating my dinner and I left my door open—just setting there talking to my wife—

Q. What was the weather that day—what was it like?

A. It was hot.

Q. It was a typical hot July day?

A. Yeah, it was hot that day, and I was setting there, you know, and he's in the habit of getting down in the floorboard, and I left the door open on the right side— on my side—and he was down playing with the clutch, you know, and things in the car and the door in that side where you go in the shop and I don't know he done it—me and my wife was setting there talking about moving, that's what we was talking about, moving and everything, and eating dinner, you know, just setting there talking, and I don't know even how he got out there until I heard him scream—

Q. You did hear the boy scream?

A. I didn't know he was out until I heard him scream. He crawled out under my legs—that's the only way he could have gotten out—crawled out—slipped out.

Q. Alright, what did you do, what did you see, and so forth?

A. Well, me and my wife jumped out of the car and run down there, and we couldn't see him for a few minutes for the kettle, you know, in front of the car —we couldn't see him." (B. of E. pp. 10, 11, 12)

The defendant, Ezell Thomas, did not deny that it was a customary practice for his employees, which practice was well known to him, to leave the "tar kettle" parked on Boyd Street, adjacent to his place of business, but he denied that this particular portion of Boyd Street was generally used by the public.

The defendant also testified there was no way to secure the faucet on the kettle so as to make it difficult to open, except to tie it down with a piece of wire but he had never heard of this being done and had never seen such a kettle with a lock on it.

Photographs of the kettle filed as exhibits in evidence show an eye or ring, through which a wire or metal rod could be passed, but it is not clear from the evidence that this eye or ring is situated at a place where the handle on the faucet could be locked to it in such a position as to keep the faucet locked in a closed position.

These exhibits also show that the faucet handle had a heavy, metal ball on it which usually holds it down in a closed position.

The other two employes of the defendant, Mr. Mahane and Mr. Elley, both testified that it was not customary

in the trade or business for faucets on tar kettles to be locked or secured closed, except that one of them testified the faucet handle was sometimes tied down while the kettle was being moved so as to keep it from jostling open.

■ Of course, the rule for determining whether or not a motion for directed verdict should be sustained, has been stated in numerous cases as follows:

The rule requires the trial Judge and the reviewing Court on appeal to look to all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. General Motors Corp. v. Dodson, 47 Tenn.App. 438, 338 S.W.2d 655; Poole v. First National Bank of Smyrna, 29 Tenn.App. 327, 196 S.W.2d 563; Phillips v. Newport, 28 Tenn.App. 187, 187 S.W.2d 965, and many other cases.

■ By applying this rule, we conclude that it was proper for the trial Judge to direct a verdict in favor of the defendant in the case of the father, Curtis Cleghorn, because the uncontroverted evidence can lead to only one conclusion and that is, the parents of this child were guilty of contributory negligence which proximately contributed to the accident by allowing him to leave the automobile unnoticed and wander into the area where the "tar kettle" was parked.

■ These parents, and, especially the father who had so recently used the kettle as a member of defendant's

crew, were in a position to know and appreciate the danger of allowing a child of such tender years to leave the automobile and wander into the area where the kettle containing hot molten tar was parked. It can make no difference whether it was the negligence of one or both of such parents which contributed to the accident, because the negligence of one is imputed to the other as was held by the Supreme Court in Shelton v. Williams, 204 Tenn. 417, 321 S.W.2d 807, and Nichols v. Nash. Housing Authority, 187 Tenn. 683, 216 S.W.2d 694.

Because of such contributory negligence, we hold that the father, Curtis Cleghorn, is precluded from recovering in his case. However, the situation is different in the child's case, due to the fact that he was much too young to be chargeable with contributory negligence. It is to be remembered that his suit is brought in his own behalf, although the suit is actually filed by his father as next friend, and the negligence of the parents cannot be imputed to him.

In considering the assignment of error in the child's case, it is necessary for us to determine from the facts and circumstances appearing in the evidence whether or not there is any evidence from which the jury could conclude that the defendant was guilty of negligence which proximately caused or contributed to the accident and injury.

Perhaps the minds of all reasonable men might conclude that a "tar kettle" without any hot tar in it was not dangerous, although it was left in a public area where children are accustomed to playing. But, we do not think all reasonable men would be likely to reach this conclusion in a case where such a kettle, similarly located,

contained hot molten tar, unless some precautions were taken to secure or lock the faucet or keep children and other persons away from it until the tar cooled to such an extent that it would not burn anyone.

The learned trial Judge relied upon Cassetty v. Mixon, 35 Tenn.App. 339, 245 S.W.2d 636, as his authority for directing a verdict in both cases, but we do not think that case is controlling. In Cassetty v. Mixon, a five year old child was playing near a large gasoline tank owned by the defendants below, which tank was, at the time, stored in the yard of the child's father. The child's father had used this tank, but when he ceased to use it, he emptied all of the gasoline that the pump would not remove from it and defendants had nothing to do with removing the gasoline from this tank.

The proof showed that while the child was playing near this tank, it exploded from some unknown cause, and injured this child after the father had told defendants to remove it from his premises. However, there was no proof that any of the defendants knew there was any gasoline remaining in the tank.

In affirming the action of the trial Judge directing a verdict, this Court said if defendants were guilty of any act of omission in not removing the tank from the yard, then it was such an act that could not have reasonably been anticipated, or foreseen the injury complained of.

There was no proof as to what caused the gasoline vapors to explode and this Court held that the act of the child's father in allowing the tank, with a broken cap and some gasoline still in it to remain in his yard, where

he knew his small children played, was negligence which was responsible for the accident.

Therefore, the Cassetty case can be distinguished from the instant case particularly because of lack of knowledge on the part of defendants of the condition and contents of the tank that were alleged to have caused the injury.

In commenting upon the duty of persons who leave machinery and other equipment in places where children may tamper with them, Prosser says:

> "And when children are in the vicinity, much is necessarily to be expected of them which would not be looked for on the part of an adult. It may be anticipated that a child will dash into the street in the path of a car or meddle with a turntable." Prosser on Torts, 3rd Ed., p. 175.

In this same text, we also find the following statement:

> "In all such cases, the question comes down essentially to one of whether the risk outweighs the utility of the actor's conduct. He may be required to guard a power line pole located in a public park, but not one in the open country; and whether he must take steps to prevent children from interfering with such an object as a stationary vehicle is entirely a matter of the circumstances of the particular case." Supra, p. 176.

As long ago as 1884, this same rule was stated in different language by Chief Justice Cooley of the Supreme Court of Michigan in Powers v. Harlow, 53 Mich. 507, 19 N.W. 257 as follows:

> "Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who

· are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly.''

We find a collection of cases in annotations in Vol. 36 A.L.R. first series, and Vol. 23, second series thereof, and we mention a few of these cases.

In the case of Szymczak v. Schillinger Bros. Co. (1916), 197 Ill.App. 585, it was held as a matter of law that one conducting a business on a lot where he had occasion to melt tar, which was poured into barrels and allowed to cool, was not liable for injuries sustained by a six year old child, who, while trespassing upon the premises, which were frequently used by children as a playground, engaged with other children in making tar balls and, by standing on a piece of concrete which he placed for the purpose, reached into one of these barrels and burned a hand in the hot tar.

· In the case of Sexton v. Noll Construction Co. (1918) 108 S.C. 516, 95 S.E. 129, it was held that one having on a vacant lot a receptacle used for melting asphalt, about one hundred feet from a sand pile where children were accustomed to play, was not liable where the faucet came out and allowed the asphalt to escape, injuring a child who happened to be passing, on the ground that the dangers which the defendant was required reasonably to anticipate and to safeguard were such as related to contact by children with such receptacle while pursuing their youthful instincts for amusement.

In Phillips Petroleum Co. v. Matthesen (1935), 171 Okl. 54, 44 P.2d 56, which was an action for the wrongful death of a five year old child, who was fatally injured while playing on a heavy eight-inch iron pipe with which

the defendant was laying a pipeline in the highway, which was placed in the public street on ground with a slope of 25 degrees toward a ditch two and one-half feet deep where the pipe was to be buried, at a place where children had within the knowledge of the defendant's workmen been playing during the day, it was held that whether the pipe was blocked or, if it was blocked, whether it was properly blocked under all the circumstances, whether it was attractive to allure children into danger, whether it was dangerous, or whether it was left in a dangerous condition, whether the situation was such as to suggest to the defendant company the probability of accident and whether such company was negligent, were all questions of fact for the jury.

Following citation of the latter mentioned case in Vol. 23 A.L.R. (2nd) p. 1160, the annotator also calls attention to Crane v. South Suburban Gas Co. (Eng) 1 KB 33—Div. Ct., where workmen employed by a gas company in repairing a gas main in a highway placed a fire pail, on which was a ladle containing molten lead, on inclosed land adjacent to the highway, which was upset accidentally by a passer-by and the molten lead spilled on a child playing nearby, it was held that there was evidence from which it could be found that the gas company was guilty of negligence in leaving the fire pail unattended and unguarded, with the knowledge that it was surrounded by children and that it was being used for molten lead.

In Shaffer Oil & Ref. Co. v. Thomas (1926), 120 Okl. 253, 252 P. 41, one operating a natural gas pipeline to which, at a point near a path used by children going to and from school, and near a playground, was attached a gasoline drip, with a stopcock valve which had no lock-

ing device and which could, therefore, easily be opened, whereupon the gas pressure would force a spray of gasoline from the stopcock a distance of several feet in the air, was held liable for the injuries sustained by an eleven year old boy who with his fourteen year old brother, on their way home from school, stopped and played with the stopcock until their clothes became saturated with gasoline, so that, upon their starting a fire to dry themselves, one of them was fatally, and the other seriously burned.

The foregoing are only a few of the cases contained in the annotations from A.L.R., wherein we find many cases in which the appellate courts of other jurisdictions have held that a directed verdict for defendant was proper and in many other cases holding that the facts and circumstances warranted submission of the question of actionable negligence to the jury. The diversity of opinion reflected in these cases leads us to the conclusion that the facts and circumstances in the child's case create an issue of fact upon which reasonable minds could differ, as they have differed in the cases cited in such A.L.R. annotations.

■ In the instant case, the jury could reach the conclusion, from the facts and circumstances, that the defendant should have anticipated that a young child playing in the street would be likely to meddle with the faucet on the kettle of molten tar or asphalt, and he should have taken precautions against such an event.

From such facts and circumstances, the jury could further conclude that the defendant's failure to anticipate the happening of such an event and taking precautions against it, was one of the proximate causes of the accident and resulting injury.

Therefore, we hold that it was error for the learned trial Judge to direct a verdict in the case of Billy Cleghorn, by next friend, vs. Ezell Thomas.

The judgment in the case of Curtis Cleghorn vs. Ezell Thomas is affirmed.

The judgment in the case of Billy Cleghorn by next friend vs. Ezell Thomas is reversed and that case will be remanded for a new trial consistent with this opinion.

The costs of this appeal will be paid, one-half by the plaintiff, Curtis Cleghorn, and the other one-half thereof, by the defendant, Ezell Thomas.

Shriver, P. J., and Todd, J., concur.